**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WENDY STARLAND | Civil Action No. 10-4930 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| ROB FUSARI, et al. | |
| Defendants. | |

**LINARES,** District Judge.

This matter comes before the Court by way of two motions: (1) Defendant Rob Fusari ("Fusari") and Rob Fusari Productions, LLC ("Fusari Productions") (collectively, "Defendants")'s motion for summary judgment seeking dismissal of all claims asserted in Plaintiff Wendy Starland ("Plaintiff" or "Starland")'s amended complaint, and (2) Plaintiff's motion for summary judgment seeking (a) dismissal of Defendants' counterclaims and affirmative defenses and (b) the imposition of a constructive trust for a percentage of Defendants' future revenue resulting from their relationship with Stefani Germanotta ("Germanotta"), professionally known as "Lady Gaga." The Court has considered the submissions made in support of, and in opposition to, each party's respective motion and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion is denied and Plaintiff's motion is granted in part and denied in part.

1

## I.  BACKGROUND AND PROCEDURAL HISTORY[1]

### A.  General Background

Starland brings this action to recover damages for Fusari's alleged breach of an oral

contract and breach of fiduciary duty.  Alternatively, Plaintiff seeks damages under the theories

of unjust enrichment and *quantum meruit.*

According to Starland, she and Fusari entered into an oral contract providing that if

Starland could discover the female equivalent of the lead singer of the band The Strokes, Fusari

would sign the artist to his production company and split any revenue resulting from their efforts

to develop the singer.  Starland claims that she performed under the contract by, among other

things, discovering Germanotta and introducing her to Fusari.  Nevertheless, Starland has not

received any compensation from Fusari.

Starland filed a complaint on September 24, 2010, and then filed an amended complaint

on October 6, 2011 asserting claims for: (1) breach of contract; (2) breach of fiduciary duty; (3)

unjust enrichment; and (4) *quantum meruit.*

---

[1] Only those facts the Court deems relevant to resolving the instant motions for summary judgment are set forth herein.  These facts are taken from the pleadings, the parties' respective Rule 56.1 statements, and the exhibits filed in support of, and in opposition to, each party's motion.  Unless otherwise noted, the Court considers these facts to be undisputed; additionally, any statement that is not specifically denied with a proper citation to the record in a responsive Rule 56.1 statement is considered to be admitted.  *See* Loc. Civ. R. 56.1.  It bears mentioning that both parties have failed to comply with Local Civil Rule 56.1 in filing their Rule 56.1 statements.  The purpose of a Rule 56.1 statement is to set forth the operative facts of the case and make clear to the Court which facts are not in dispute.  Neither party has coherently set forth the operative facts of the case in their respective Rule 56.1 statements; indeed, this Court has had no choice but to extensively review the record to piece together the operative facts like a jigsaw puzzle.  The very purpose of Local Civil Rule 56.1 is to avoid this result.  Additionally, both parties are guilty of including legal argument in their respective Rule 56.1 statements and responses.  Local Civil Rule 56.1 specifically provides that Rule 56.1 statements *"shall not* contain legal argument or conclusions of law."  Accordingly, the Court will disregard legal arguments and conclusions of law contained within the Rule 56.1 statements and responses, including evidentiary objections to the Court's consideration of certain facts, as such objections should have been raised in the briefs.  Finally, the Court notes that none of the briefs Defendants have filed contains either a table of contents or a table of authorities.  Local Civil Rule 7.2(b) provides that "[a]ny brief *shall include a table of contents and table of authorities*."  (emphasis added).  The Court is perturbed by the parties' failure to comply with the Local Civil Rules in light of the fact that this is at least the third time they have filed their respective summary judgment motions.  Counsel are admonished that they are to strictly comply with the Local Civil Rules in making any future submissions to the Court, and that failure to do so may result in the imposition of sanctions.

On October 13, 2011, Defendants filed an answer to Starland's complaint asserting the following affirmative defenses: (1) the complaint fails to state a claim for which relief can be granted; (2) Starland's claims are barred by the statute of frauds; (3) Starland's claims are time-barred; (4) Starland's claims are barred by the doctrine of estoppel; and (5) Starland's claims are barred by the doctrine of unclean hands and laches.

In their answer, Defendants also asserted the following counterclaims: (1) defamation; (2) slander *per se*; and (3) false light. These counterclaims arise out of allegedly false statements Starland made about Defendants to Maureen Callahan ("Callahan"), author of *Poker Face: The Rise and Rise of Lady Gaga* (hereinafter "*Poker Face*").

Starland filed a motion for summary judgment seeking dismissal of Defendants affirmative defenses and his counterclaims on August 15, 2013. On September 20, 2013, Defendants filed a motion for summary judgment seeking dismissal of all claims asserted in Starland's amended complaint.

B.    The Parties

Starland is a singer, songwriter, and music producer residing in Hollywood, California. (Am. Compl. at ¶¶ 4, 7.) Fusari is a songwriter and music producer residing in Parsippany, New Jersey, and is the sole owner of Fusari Productions, which is engaged in the business of producing music. (*Id.* at ¶ 8.) Since at least 2005, Starland and Fusari regularly collaborated on writing songs. (*Id.* at ¶ 9; *see also* Pl. Supp. Statement of Undisputed Material Facts ("SUMF") at ¶ 1(k).)

C.    Terms of the Alleged Oral Contract between Starland and Fusari

In or about July 2005, Fusari met with Starland and told her that he would like for her to search for the female equivalent to the lead singer of the band, The Strokes. (Pl. Supp. SUMF at

3

¶ 1(a).)[2] During their conversation, Fusari told Starland that if she found an artist who was acceptable to him, he would sign this artist to his production company. (*Id.* at ¶ 1 (e); Def. Resp. SUMF at ¶¶ 4-5.) Fusari allegedly also told Starland that he would work with her to write songs for and develop the artist, and that any revenue resulting from their project would be split 50/50. (Pl. Supp. SUMF at ¶ 1(e).; Def. SUMF at ¶ 22.) "Neither party anticipated any potential losses in connection with their [agreement], although they each understood that they would each absorb incidental expenses involved in the performance of the [agreement]." (Def. Resp. to Pl. Supp. SUMF at ¶ 5(c).)

Starland accepted the terms of Fusari's offer, and did everything Fusari asked her to do with respect to finding the female equivalent to the lead singer of The Strokes. (Pl. Supp. SUMF at ¶¶ 3(b), 1(f).)

### D. Starland Discovers Germanotta and Introduces her to Fusari

Following their conversation in or about July 2005, Starland allegedly spent a substantial amount of time over an approximately eight month period searching for a singer of the type Fusari was looking for. (*See* Am.Compl. at ¶ 10.) Aside from looking for the type of artist that would be acceptable to Fusari, Starland acknowledged that her efforts also had another purpose—namely, to have fun and "keep her eyes and ears" open for artistic talent. (Def. SUMF at ¶ 26, quoting Starland Depos. Tr. at 130:4-10.)

On or about March 23, 2006, Starland discovered Germanotta performing at The Cutting Room in New York, which is presumably a nightclub. (*See* Pl. SUMF at ¶ 6; *see also* Am. Compl. at ¶ 11.) Starland was impressed with Germanotta's performance and called Fusari to

---

[2] According to Starland, the July 2005 conversation took place in New Jersey. (*See* Starland Depos. Tr. at 29:5-14.) Fusari, on the other hand, claims that this conversation took place in New York. (Fusari Depos. Tr. at 198:17-199:2.)

tell him she had found his unique artist. (Pl. SUMF at ¶ 7.) Starland then put Germanotta on the phone with Fusari. While the two spoke, Fusari listened to some of Germanotta's music on a website. Although not particularly impressed with Germanotta's song selection, Fusari invited her to his production studio in Parsippany, New Jersey, where they eventually met. (Pl. SUMF at ¶ 7; Def. Resp. SUMF at ¶ 9.)

E.     <u>Development of Fusari and Germanotta's Personal and Professional Relationship</u>

On or about April 13, 2006, Fusari attended a performance Germonotta gave at a club named Sin-e. (Pl. SUMF at ¶ 9.) Fusari thought that Germanotta's performance was weak, and determined that she needed a lot of development. (*Id.* at ¶ 13.) Although Fusari was ready to give up on Germanotta after hearing her perform, Starland allegedly persuaded him to continue working with her. (Pl. Supp. SUMF at ¶ 8(b).)

During the months that followed, Germanotta regularly met with Fusari at his production studio where they focused on writing music and "finding a sound for [Germanotta]." (*See* Fusari Complaint against Team Love Child, LLC & Mermaid Music, LLC (hereinafter the "Fusari Complaint") at ¶ 17.) Starland claims that she also regularly met with Germanotta to collaborate on developing her songs, musical style, and artistic development . (Am. Compl. at ¶ 13; Pl. Supp. SUMF at ¶ 3(c).) Fusari was allegedly kept apprised of Starland's interactions with Germanotta, and worked individually with Starland on Germanotta's music, style and development. (*See* Def. Resp. to Pl. Supp. SUMF at ¶ 3(c).)[3]

At some point, Starland asked to join Fusari and Germanotta at their music writing sessions in Fusari's production studio. (Pl. Supp. SUMF at ¶ 3(d).) Fusari and Germanotta,

---

[3] During his deposition, Fusari admitted that he knew that Starland and Germanotta spent time together as friends, but denied knowing whether Starland did any work in terms of helping Germanotta develop artistically. (*See* Fusari Depos. Tr. at 30-31.)

however, discouraged Starland from attending these sessions because Fusari and Germanotta had developed a romantic relationship and engaged in personal activities at the production studio. (*Id.* at ¶ 3(e); Def. Resp. SUMF at ¶ 17; Def. Resp. to Pl. Supp. SUMF at ¶ 3(e).) At the time that Fusari and Germanotta became romantically involved, Fusari was in a romantic relationship with Jayne Digregorio ("Digregorio"), with whom he has lived since 2002 and to whom he was at one point engaged. (Pl. SUMF at ¶¶ 14-16; Def. SUMF at ¶¶ 14-16.)

As a result of his romantic interest in Germanotta, Fusari entered into an agreement that was more favorable to Germanotta than he had originally intended. (Pl. Supp. SUMF at ¶ 6(a).) Specifically, Fusari originally intended to sign Germanotta to a standard production deal with Fusari Productions, which would allow Fusari's company to develop and produce Germanotta's master sound recordings and then distribute them under a separate distribution deal through one of the registered major record labels. (*See* Fusari Complaint at ¶¶ 22-26.) Instead, however, in or about May 2006, Fusari entered into an agreement with Mermaid Music, LLC ("Mermaid"), an entity owned and operated by Germanotta and her father, Joe Germanotta, to form Team Love Child, LLC ("TLC"). (Am. Compl. at ¶ 14; *see also* Fusari Compl. at ¶ 22.) Under the terms of the agreement, Fusari owned twenty percent of TLC and Mermaid owned eighty percent. (Fusari Compl. at ¶ 26.) Starland claims that Fusari failed to include her in negotiating the agreement with Germanotta and her father. (Am. Compl. at ¶ 14; *see also* Def. Resp. to Pl. Supp. SUMF at ¶ 7(a).)

After Fusari, Germanotta, and her father formed their agreement, TLC entered into a recording contract with a major record label to exploit Germanotta's music and persona. (*Id.* at ¶ 15.) Germanotta's career subsequently skyrocketed as she produced various albums including

*The Fame* and *Blueberry Kisses*. (*See* Pl. Supp. SUMF at ¶ 12.)

As Fusari and Germanotta's relationship continued to evolve, Starland allegedly cautioned Germanotta to "look out for [her]self," because Fusari may not have her "best interests at heart." (*See* Germanotta Depos. Tr. at 94:11-17.) Starland also acknowledged telling Germanotta that songs she wrote with Fusari like *Blueberry Kisses* and other Beatles-inspired tracks were inconsistent. (*See* Starland Depos. Tr. at 72:3-8.)

As a result of his relationship with Germanotta, Fusari earned millions of dollars. (Pl. Resp. SUMF at ¶ 4(a).) Nevertheless, Fusari has not compensated Starland for introducing him to Germanotta or for any of her other alleged efforts in artistically developing Germanotta. (*See* Def. Resp. to Pl. Supp. SUMF at ¶ 4(b).) According to Sheldon Steiger ("Steiger"), Starland's damages expert, the reasonable value of Starland's services to Fusari is approximately ten percent of the revenue Fusari "has received and will continue to receive from his work with . . . Germanotta after his out of pocket expenses are recouped." (Steiger Expert Rep., CM/ECF No. 285-5 at 32.)

F.  Starland's Allegedly Defamatory Statements to Callahan

In their counterclaim, Defendants allege that Starland made the following defamatory Statements to Callahan during a 2010 interview:

> (1)  "That the Plaintiff was 'working as a scout for New Jersey-based producer Fusari.'" (Counterclaim at ¶ 7(a).)
>
> (2)  "That 'Fusari had tasked Starland with finding a girl who was twenty-five years old or younger, who, in his words, 'could be the lead singer of the Strokes.'" (*Id.* at ¶ 7(b).)
>
> (3)  "That Fusari was angered when he was first introduced to Stefani, saying to Starland, 'Don't waste my time.'" (*Id.* at ¶ 7(c).)
>
> (4)  "That Starland's 'first mistake' was not getting an agreement with Fusari in writing." (*Id.* at ¶ 7(d).)

(5)     "That Fusari called Starland after seeing Stefani perform and said, 'are you kidding me? Are you f***ing kidding me?'" (*Id.* at ¶ 7(e).)

(6)     "That, reluctantly, Fusari 'agreed to have one meeting with Stefani.'" (*Id.* at ¶ 7(f).)

(7)     "That even though Fusari tells the newspapers that he 'knew within five seconds,' this was 'not true.'" (*Id.* at ¶ 7(g).)

(8)     "That 'Starland was helping with Fusari and a future record deal.'" (*Id.* at ¶ 7(h).)

(9)     "That, despite, *inter alia*, 'Fusari's claim that [the Gaga name] was the result of misspelled text, Gaga's claim that it was something Fusari said to her while she was playing a Queen B-side, 'You're so gaga!,' 'the name arrived in a far more typical, pedestrian way: a marketing idea.'" (*Id.* at ¶ 7(i).)

(10)    "That Fusari developed a romantic relationship with Stefani despite the fact that he had a fiancée." (*Id.* at ¶ 7(j).)

(11)    "That Starland asked Fusari 'why he would jeopardize his current relationship; he told her that the prospect of the money and the fame was a rush.'" (*Id.* at ¶ 7(k).)

(12)    "That the Plaintiff told Gaga that she spent 'all this time and energy and work writing these songs and creating a vision [for her], putting all this together.'" (*Id.* at ¶ 7(l).) (bracketed text in original).

(13)    "That the Plaintiff 'discover[ed Gaga] and introduc[ed] her to Fusari." (*Id.* at ¶ 7(m).)

Callahan allegedly published these statements in *Poker Face*. (Counterclaim at ¶ 7.) During his deposition, Fusari testified that as a result of Callahan's publication of Starland's alleged statements in *Poker Face*, he suffered financial harm. Specifically, Fusari testified that Tom Hamilton ("Hamilton")—the father of a teenage girl with whom Fusari had been working for years—severed his daughter's professional relationship with Fusari because he did not feel comfortable with Fusari "being in the studio with his young daughter." (*See* Fusari Depos. Tr. at 257-58.)

## II.  JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## III.  LEGAL STANDARD

"Summary judgment should be granted only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Bender v. Twp. of Monroe*, 289 Fed. App'x. 526, 526-27 (3d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). On a summary judgment motion, the moving party must first show that there is no genuine issue of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact; the non-moving party may not simply rely on unsupported assertions, bare allegations, or speculation. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## IV.  DISCUSSION

### A.  <u>Defendants' Motion for Summary Judgment</u>

In arguing that they are entitled to summary judgment as to all of Starland's claims, Defendants make the following arguments: (1) the parties did not enter into an enforceable contract; (2) Starland's breach of fiduciary duty claim fails as a matter of law because the undisputed facts demonstrate that Starland and Fusari did not enter into a joint venture; and (3) Starland's unjust enrichment and *quantum meruit* claims fail because any alleged benefit

Starland conferred on Defendants did not result in any losses to her and the expert testimony she has proffered fails to establish the reasonable value of her alleged services.

The Court will now proceed to address the merits of Defendants' arguments.

a. Whether Defendants are Entitled to Summary Judgment as to Starland's Breach of Contract Claim

"Under New Jersey law, a valid contract exists where there is an offer, acceptance and consideration." *Newark Bay Congeneration P'ship, LP v. ETS Power Grp.*, No. 11-2441, 2012 U.S. Dist. LEXIS 141068, at *6 (D.N.J. Sept. 28, 2012) (citation omitted). "An enforceable contract is thus created if the parties 'agree on essential terms and manifest an intention to be bound by those terms.'" *Nissen v. Rosza*, No. 08-5563, 2011 U.S. Dist. LEXIS 67171, at *14 (D.N.J. June 23, 2011) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992)). "An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly not an enforceable one." *Lo Bosco v. Kure Eng'g*, 891 F. Supp. 1020, 1025 (D.N.J. 1995) (quoting *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 474 (App. Div. 1978)). However, "[t]he law generally and in New Jersey does not favor voiding contracts for vagueness." *Lo Bosco*, 891 F. Supp. at 1026; *see also Lynch v. New Deal Delivery Serv.*, 974 F. Supp. 442, 457 (D.N.J. 1997) ("Voiding a contract for vagueness is not favored."); *Paley v. Barton Savs. & Loan Ass'n*, 82 N.J. Super. 75, 83 (App. Div. 1964) ("If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.") (quoting 1 *Corbin, Contracts*, § 95, p. 400 (1963)).

Here, Defendants argue that the purported agreement between the parties is too vague to constitute an enforceable contract because the agreement left a number of issues open, including: (1) how long the agreement would last; (2) who would assume responsibility for developing which aspects of the singer's career; (3) who would work to develop the artist; (4) who would make the final decision if there were a disagreement regarding control of the artist; (5) who would attend performances to critique the artist; and (6) whether Starland's share of the profits would depend on the number of songs she wrote or co-wrote for the artist. (*See* Def. Br. at 4-5; *see also* Def. Reply Br. at 3-8.) In essence, Defendants argue that Starland and Fusari's failure to specify the terms governing every conceivable issue that might arise under their agreement is sufficient to compel this Court to hold, as a matter of law, that no enforceable contract existed.

Defendants' argument fails to persuade this Court. The inquiry before the Court is not whether the parties agreed to terms governing every issue that might arise under the alleged contract, but whether a reasonable jury could find that Fusari made a reasonably specific offer that Starland accepted in exchange for consideration. Construing the facts in the light most favorable to Starland compels this Court to answer this inquiry in the affirmative.

The facts in the record suggest that Fusari offered Starland a fifty percent stake in a project involving her identifying a female equivalent to the lead singer of The Strokes, and working with him to develop that singer artistically and write songs for her. The facts also suggest that Starland accepted Fusari's offer, and then undertook efforts to identify the type of singer Fusari sought. Finally, the facts suggest that once Starland identified Germanotta as that singer, she worked with both Fusari and Germanotta to develop Germanotta's artistic appeal, in spite of being discouraged from attending the music writing sessions at Fusari's production studio.

11

The Court fails to see how the terms to which the parties allegedly agreed are so vague as to be unenforceable as a contract. Because there are genuine issues of material fact as to whether Fusari made an offer to Starland to participate in a project in exchange for fifty percent of the revenue resulting from that project, it would be premature at this stage for the Court to conclude—as a matter of law—that no valid contract existed. Accordingly, insofar as Defendants have moved for summary judgment on the grounds that no valid contract existed, the motion is denied.

      b.     <u>Whether Defendants are Entitled to Summary Judgment as to Starland's Breach of Fiduciary Duty Claim</u>

"New Jersey requires the following elements to establish a breach of fiduciary duty: a fiduciary relationship between the parties, breach of the duty imposed by that relationship, and a harm to the plaintiff." *ACE American Ins. Co. v. Wachovia Ins. Agency, Inc.*, No. 08-4369, 2008 WL 4630486, at *6 (D.N.J. Oct. 17, 2008) (citing *McKelvey v. Pierce*, 173 N.J. 26 (2002)). According to Starland, Fusari owed her a fiduciary duty because their "relationship . . . constituted a joint venture." (Am. Compl. at ¶ 25.) Defendants, on the other hand, maintain that "the undisputed material facts demonstrate that . . . [Starland] cannot establish a joint venture— the requisite basis for her breach of fiduciary duty claim—as a matter of law." (Def. Br. at 12.)

Under New Jersey law, a joint venture is defined as "[a] special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation." *Ginsberg v. Bistricer*, No. A-5751-03T5, 2007 N.J. Super. Unpub. LEXIS 474, at * 32 (App. Div. Apr. 4, 2007) (citing *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div. 1962) (quoting *Kurth v. Maier*, 133 N.J. Eq. 388, 391 (E. & A. 1943)). In other words, a joint venture is "an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." *Wittner*, 72 N.J. Super.

at 444. "The *sine qua non* of a joint venture is a <u>contract</u> purposely entered into by the parties. The joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly *ex contractu*, express or implied." *Id.* at 443 (emphasis added); *see also United States v. USX Corp.*, 68 F.3d 811, 826 (3d Cir. 1995) ("The *sine qua non* of a joint venture is a contract, express or implied; that is, an actual *agreement* between the parties.") (citation omitted) (emphasis in original).

New Jersey courts have recognized that a joint venture requires some or all of the following:

    (A)    A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

    (B)    A joint property interest in the subject matter of the venture;

    (C)    A right of mutual control or management of the enterprise;

    (D)    Expectation of profit, or the presence of "adventure," as it is sometimes called;

    (E)    A right to participate in the profits; [and]

    (F)    Most usually, limitation of the objective to a single undertaking or *ad hoc* enterprise.

*Kocher v. UC Overlook Dev., LLC*, 2010 N.J. Super. Unpub. LEXIS 870 (App. Div. Apr. 22, 2010) (quoting *Wittner*, 72 N.J. Super. at 444).

In arguing that no joint venture existed, Defendants largely advance the same theory they advanced in support of their argument that no enforceable contract existed—namely, that the terms of the purported agreement between Starland and Fusari are too vague to constitute a joint venture. (*See* Def. Br. at 12-16.) As the Court has held that a reasonable jury may find that the parties entered into an enforceable contract, it necessarily follows that a reasonable jury may also find that a joint venture arose out of the parties' contractual relationship. *See Wittner*, 72 N.J.

Super. at 444 (noting that a joint venture arises out of a contractual relationship); *see also USX Corp.*, 68 F.3d at 827 ("We need go no further than the first element, the existence of an agreement to form a joint venture, to conclude that a genuine issue of material fact precludes summary judgment on [the defendant's] liability" as a joint venturer.).[4] Therefore, insofar as Defendants have moved for summary judgment on Starland's breach of fiduciary duty claim on the grounds that the parties never entered into a joint venture, Defendants' motion is denied.

     c.     Whether Defendants are Entitled to Summary Judgment as to Starland's Unjust Enrichment Claim

It is well settled that "a plaintiff may not recover on both a breach of contract claim and an unjust enrichment claim." *R.D. Legal Funding v. Cohen*, No. 13-77, 2013 U.S. Dist. LEXIS 110875, at *23 (D.N.J. Aug. 7, 2013) (citing *Goldsmith v. Camden Cty. Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009)). However, a plaintiff may assert alternative claims for breach of contract and unjust enrichment when, as in this case, the existence and enforceability of a contract are disputed. *See, e.g., Mendez v. Avis Budget Grp.*, No. 11-6537, 2012 U.S. Dist. LEXIS 50775, at *24 (D.N.J. Apr. 10, 2012) (denying motion to dismiss unjust enrichment and breach of contract claims, but noting that "if a valid written contract existed . . . then the existence of this contract would prevent Plaintiff from recovering for quasi-contractual liability as asserted in an unjust enrichment claim."); *see also Caputo v. Nice-Pak Prods., Inc.*, 300 N.J.

---

[4] Defendants also argue that no joint venture existed because Starland has failed to satisfy all of the elements of a joint venture set forth in *Wittner*. (*See* Def. Br. at 12-18.) Specifically, Defendants maintain that : (1) Starland did not agree to share losses with Fusari, (*see* Def. Br. at 16; Def. Reply Br. at 10); (2) the parties lacked a unity of purpose (*see* Def. Br. at 17; Def. Reply Br. at 9, 11); (3) Starland "lacked . . . any interest in and right of control over the artist she would bring to Fusari, (Def. Br. at 12); and (4) as a result of the parties being "on an even playing field[,] . . . Fusari could not have owed [Starland] a fiduciary duty," (Def. Br. at 18; Def. Reply Br. at 11.) It would be inappropriate for this Court to resolve these primarily factual arguments on a motion for summary judgment. More importantly, *all* of the *Wittner* elements need not be present to create a triable issue as to whether a joint venture existed. *See Wittner*, 72 N.J. Super. at 444 (noting that "there is substantial agreement that *some* or all" of the elements of a joint venture must be present to find the existence of a joint venture) (emphasis added).

Super. 498, 504 (App. Div. 1997) ("[A] plaintiff who has attempted to prove both breach of contract and unjust enrichment need not choose which one will go to the jury, as long as there is sufficient evidence as to both. Under proper instructions from the judge, the jury may decide which of the two was proved, and plaintiff will be able to recover under one of the theories.")

"To establish unjust enrichment, a plaintiff must show both that [1] defendant received a benefit and [2] that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). "The unjust enrichment doctrine requires that [a] plaintiff show that it expected remuneration from the defendant at the time that it performed or conferred a benefit." *Id.*

Here, there is no dispute that Starland introduced Germanotta to Fusari, and that Fusari has made millions of dollars as a result of his relationship with Germanotta. Based on these facts, a reasonable jury may find that Starland has conferred a benefit upon Fusari, and has thus satisfied the first element of an unjust enrichment claim.

As to the second element, there is no dispute that Fusari has failed to compensate Starland for introducing him to Germanotta, in spite of the alleged agreement to split the revenue resulting from their project 50/50. Based on this fact alone, a jury may find that Fusari has frustrated Starland's legitimate expectation of payment, and that it would thus be unjust for Fusari to retain the benefit that Starland conferred upon him.

Without specifically addressing why there is no genuine issue of material fact as to why Starland cannot satisfy the elements of an unjust enrichment claim, Defendants make five arguments in support of their proposition that summary judgment should be granted as to this claim, none of which have merit.

First, Defendants suggest that Starland's unjust enrichment claim is doomed by her

15

admission that the time she spent searching for the female equivalent to the lead singer of The Strokes had the secondary aims of having fun, meeting up with friends, and looking for talent. (*See* Def. Br. at 19.) This argument lacks merit as the Court is unaware of, and Defendants do not cite to, any authority suggesting that if a party's actions in the course of conferring a benefit to another have secondary aims, that party may not prevail on an unjust enrichment claim.

Second, Defendants argue that Starland cannot recover under a theory of unjust enrichment because she has not sustained any losses as a result of her having conferred a benefit upon Fusari. In so doing, they rely on *Cameco, Inc. v. Gedicke*, a case in which the Appellate Division suggested that enrichment to a party "is not unjust [where] it did not result in any loss or harm to [the plaintiff]." 299 N.J. Super. 203, 218 (App. Div. 1997). Even if the Court were to agree that suffering losses were an element of an unjust enrichment claim, construing the facts in the light most favorable to Starland compels this Court to conclude that there are issues of fact as to whether Starland suffered losses. To provide only one example, a reasonable jury may find that Starland suffered a loss because Fusari failed to pay her what he promised in spite of her having invested the time in discovering Germanotta rather than in some other potentially more profitable endeavor.

Third, Defendants argue that Starland's unjust enrichment claim fails because she admitted that "she did not co-write any of the songs on 'The Fame.'" (Def. Br. at 20.) This argument lacks merit as the Court fails to see how it, in any way, undermines the notion that there are sufficient facts in the record to support a reasonable finding that Starland has satisfied the elements of an unjust enrichment claim.

Fourth, Defendants argue that Starland's admission that she expected compensation from Germanotta should compel the Court to grant summary judgment as to her unjust enrichment

claim. Again, the Court does not see how this argument is relevant to the issue of whether the facts in the record could support a reasonable finding that Starland has established a *prima facie* case of unjust enrichment.

Finally, Defendants argue that summary judgment is appropriate as to Starland's unjust enrichment claim because "Fusari testified that he had no personal knowledge that the Plaintiff did anything in connection with Germanotta other than to introduce her to him . . . [and that,] therefore, any alleged 'benefit' she conferred on him was not one he was aware of." (Def. Br. at 22.) Defendants' argument assumes that Starland's efforts to identify Germanotta as the female equivalent to the lead singer of The Strokes, and Starland's subsequent introduction of Germanotta to Fusari, cannot amount to a conferred benefit. The Court rejects the assumption upon which Defendants' argument is premised because a reasonable jury could find that Starland's introduction of Germanotta to Fusari conferred a benefit upon Fusari.

For these reasons, the Court will not grant Defendant's motion for summary judgment as to Starland's unjust enrichment claim.

     d.    <u>Whether Defendants are Entitled to Summary Judgment as to Starland's *Quantum Meruit* Claim</u>

"To recover under a theory of *quantum meruit*, a plaintiff must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)).

Here, the crux of Defendants' argument as to why summary judgment is appropriate as to Starland's *quantum meruit* claim is that "her expert has failed to establish the reasonable value of her services." (Def. Br. at 22.) Specifically, they maintain that Starland's expert "had an

inadequate basis [up]on which to estimate the reasonable value of Starland's alleged services to Defendants." (*Id.*)

In his expert report, Steiger opines that the reasonable value of Starland's introduction of Germanotta to Fusari is, approximately, ten percent of the revenue Fusari "has received and will continue to receive from his work with . . . Germanotta after his out of pocket expenses are recouped." (Steiger Expert Rep., CM/ECF No. 285-5 at 32.) Steiger's opinion is based, in part, on the assertion that "standard practice in the music industry [is for] a producer . . . [to] pay[] up to 10% or more of the proceeds of a project in exchange for an introduction to an outstanding artist with the potential to succeed greatly." (*Id.*)

At this stage, it would be premature for the Court to hold that Steiger's opinion is unworthy of credit because the bases upon which it rests are inadequate. *See, e.g., Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (noting that Federal Rule of Evidence "702, which governs the admissibility of expert testimony, has a liberal policy of admissibility.") (citation omitted); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) ("The analysis of [an expert's] conclusions themselves is for the trier of fact when the expert is subject to cross-examination.") (citation omitted). Accordingly, the Court will not grant summary judgment as to Plaintiff's claim for *quantum meruit*.

**B.    Starland's Motion for Summary Judgment**

Having determined that Defendants are not entitled to summary judgment as to Starland's affirmative claims, the Court will now consider the propriety of granting Starland's motion for summary judgment seeking: (a) dismissal of Defendants' affirmative defenses and counterclaim, and (b) the imposition of a constructive trust.

a.    <u>Whether Starland is Entitled to Summary Judgment as to Defendants' Affirmative Defenses</u>

At the outset, the Court notes that Defendants oppose summary judgment as to only two of their affirmative defenses—specifically, that Starland's claims are barred by the Statute of Frauds and the doctrine of unclean hands. Defendants appear to concede the point that summary judgment should be granted as to the remaining affirmative defenses, as they have not made any arguments to the contrary in their opposition brief. *See, e.g., Majka v. Prudential Ins. Co. of Am.*, 171 F. Supp.2d 410, 414 (D.N.J. 2001) (holding that arguments not opposed in brief in opposition to summary judgment motion are deemed to be conceded). Accordingly, the Court will grant Plaintiff's motion insofar as it seeks summary judgment as to the following affirmative defenses: (1) that the complaint fails to state a claim for which relief can be granted; (2) that Starland's claims are time-barred; (3) that Starland's claims are barred by the doctrine of estoppel; and (4) that Starland's claims are barred by the doctrine of laches.

      i.    <u>Propriety of Granting Summary Judgment as to Defendants Affirmative Defense based on the Statute of Frauds</u>

The New Jersey Statute of Frauds provides that certain agreements are unenforceable unless they are in writing and signed by the party against whom the agreement or promise is offered. *See* N.J.S.A. 25:1-5. The statute applies only to: (1) agreements in consideration of marriage; (2) certain loans in excess of $100,000; (3) certain agreements by creditors to forbear from exercising rights under a contract; and (4) certain promises to provide non-marital support. *See id.*

It is clear that the alleged agreement between Starland and Fusari does not fall under any of the categories to which the New Jersey Statute of Frauds applies, and Defendants do not argue otherwise. Rather, without explaining why this Court should apply New York law (while tacitly conceding that the claims at issue in this case are governed by New Jersey law by citing to New

Jersey legal authorities in their briefs), Defendants argue that there is a genuine issue of material fact as to whether Starland's claims are barred by N.Y. Gen. Obligations Law § 5-701(a)(1).

N.Y. Gen Obligations Law § 5-701(a)(1) provides, in relevant part, that unwritten agreements are void if they "cannot be performed within one year from [their] making . . . or . . . perform[ed] . . . before the end of a lifetime." The New York Court of Appeals has "long interpreted this provision of the Statute of Frauds to encompass only those contracts which, by their terms, 'have *absolutely no possibility* in fact and law of full performance within one year.'" *Cron v. Hargro Fabrics*, 91 N.Y.2d 362, 366 (1998) (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 454 (1984)) (emphasis added). In other words, "[a]s long as the agreement may be 'fairly and reasonably interpreted' such that it may be performed within a year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame." *Id.* (quoting *Warren Chem. & Mfg. Co. v. Holbrook*, 118 N.Y. 586, 593 (1890)).

As an initial matter, neither party has specifically argued why New York law should apply in this case and the Court does not see why New Jersey law should not govern the claims at issue. *See, e.g., Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006) (noting that "[t]here is a presumption that the law of the situs state applies" when a federal court exercises diversity jurisdiction).

Nevertheless, even if this Court were to apply New York law, the alleged agreement between Starland and Fusari could be interpreted such that performance could take place within one year. To provide just one example, it is conceivable that within one year: (a) Starland could have found the female equivalent to the "Strokes Girl"; (b) Fusari could have signed her to a production contract; (c) Starland and Fusari could have written and produced an album; and (d)

Starland and Fusari could have signed a contract with a record label and sold their rights to the label for a single, lump sum. As there is a possibility that the alleged agreement between Starland and Fusari could have been fully performed within one year, N.Y. Gen. Obligations Law § 5-701(a) would not bar the enforceability of their alleged agreement. *See, e.g., Cron*, 91 N.Y.2d at 366.

Accordingly, insofar as Starland has moved for summary judgment on Defendants' affirmative defense based on the Statute of Frauds, Starland's motion is granted.

ii.     Propriety of Granting Summary Judgment as to Defendants' Affirmative Defense Based on the Doctrine of Unclean Hands

"The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001). "In simple parlance, [the doctrine of unclean hands] merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter of the suit." *Borough of Princeton v. Bd. of Chosen Freeholders of Mercer*, 169 N.J. 135, 158 (2001).

Starland argues that because she seeks money damages, "the affirmative defense of unclean hands fails as a matter of law." (Pl. Br. at 11.)

It is well settled that "unclean hands is an equitable remedy and is not an available defense to claims for monetary relief." *E.g., Sprenger v. Trout*, 375 N.J. Super. 120, 136 (App. Div. 2005). Thus, Defendants may not assert the affirmative defense of unclean hands to Starland's legal, as opposed to equitable, claims—namely, Starland's claims for breach of contract and breach of fiduciary duty. *See Datasphere, Inc. v. Computer Horizons Corp.*, No. 05-2717, 2009 U.S. Dist. LEXIS 59269, at *26 (D.N.J. July 13, 2009) ("Courts widely agree that

21

equitable affirmative defenses cannot defeat a claim at law for breach of contract."); *id.* at \*27 (noting that a claim for breach of fiduciary duty "is an action at law for tort damages, not an action in equity"); *see also Dr. Zhu Inv. Trade Corp. v. Natural Food Import USA, Inc.*, No. L-4022-09, 2012 WL 3236111 (App. Div. July 12, 2012) (holding that unclean hands was unavailable as an affirmative defense to claims for breach of contract and fraud).

The Court is mindful, however, that Starland has asserted two equitable claims seeking money damages—unjust enrichment and *quantum meruit*.[5] A plaintiff who seeks damages under an equitable theory seeks an equitable remedy. *See, e.g., Sim Kar Lighting Fixture Co. v. Genlyte*, 906 F. Supp. 967, 974 (D.N.J. 1995) ("It is clear that a claimant who prays for damages based on unjust enrichment is seeking an equitable remedy.") (citing *Peterson v. Crown Fin. Corp.*, 661 F.2d 287, 295 (3d Cir. 1981)). Thus, the fact that Starland seeks money damages is, in itself, no reason to bar Defendants from pursuing their equitable defense of unclean hands with respect to Starland's equitable claims for unjust enrichment and *quantum meruit*. *See, e.g., Hovbilt, Inc. v. Lair*, 2010 WL 668757 (App. Div. Feb. 25, 2010) (reversing award of money damages under theory of *quantum meruit* because "a party is not entitled to reap the benefits of the quantum meruit remedy unless he has acted in good faith.") (citing *Chrisomalis v. Chrisomalis*, 260 N.J. Super. 50, 53-54 (App. Div. 1992)); *Peek v. Johl*, No. A-0499-10T4, 2012 N.J. Super. Unpub. LEXIS 2684, at \*11-\*12 (App. Div. Dec. 11, 2012) (holding that the plaintiffs' unclean hands barred claim for unjust enrichment).

---

[5] Defendants assert, and Plaintiffs do not dispute, that *quantum meruit* is an equitable claim. The Court notes, however, that New Jersey courts have characterized claims for *quantum meruit* as both equitable and legal. *Compare, e.g., La Mantia v. Dust*, 234 N.J. Super. 534, 540 (App. Div. 1989) (characterizing *quantum meruit* claim as equitable); *with, e.g., Kopin v. Orange Prods., Inc.*, 297 N.J. Super. 353, 373 (App. Div. 1997) (noting that *quantum meruit* "is actually a legal remedy, albeit one based on equitable principles."). The Court has assumed for purposes of deciding Starland's motion that her *quantum meruit* claim is an equitable one, as she appears to concede this point.

The question then becomes whether construing the facts in the light most favorable to Defendants, a reasonable jury might find that Starland had unclean hands. According to Starland, she is entitled to summary judgment as to Defendants' affirmative defense of unclean hands because "Fusari cannot prove that Starland engaged in any inequitable or fraudulent conduct." (Pl. Br. at 11.) This argument does not persuade the Court.

During her deposition, Germanotta confirmed that Starland would tell her "to look out for [her]self and be careful" because Fusari may not have her "best interests at heart." (*See* Germanotta Depos. Tr. at 94:11-17.) Starland, herself, admitted telling Germanotta that songs she wrote with Fusari like *Blueberry Kisses* and other Beatles-inspired tracks were inconsistent. (*See* Starland Depos. Tr. at 72:3-8.) Based on these facts, a reasonable jury might find that Starland breached the terms of her alleged contract and joint venture with Fusari by trying to steer Germanotta away from working with him, and thus acted in bad faith.

At this stage, the Court's task is not to determine whether Starland's actions bar her claims for unjust enrichment and *quantum meruit*. Rather, the Court is tasked with determining whether Defendants are entitled to pursue their affirmative defense of unclean hands. As there are genuine issues of material fact as to whether Starland had unclean hands, the Court will allow Defendants to pursue this affirmative defense.

c.   Whether Starland is Entitled to Summary Judgment as to Defendants'
        Counterclaims

The Court will now address the propriety of granting summary judgment as to Defendants' counterclaims for defamation, slander *per se*, and false light.

i.   Propriety of Granting Summary Judgment as to Defendants' Counterclaim
        for Defamation

To prevail on their defamation counterclaim, Defendants must establish that: (1) Starland

made false and defamatory statements about them; (2) the false and defamatory statements were communicated to a third party and not privileged; and (3) Starland acted negligently or with actual malice in making the false and defamatory statements. *See G.D. v. Kenny*, 205 N.J. 275, 293 (2011). A defamatory statement may consist of libel (i.e., a written defamatory statement) or slander (i.e., an oral defamatory statement).[6] *W.J.A. v. D.A.*, 210 N.J. 229, 238 (2012).

"To establish a slander claim under the common law, a plaintiff [or counterclaimant] is required to show 'special damages,' which is defined as 'harm of a material or pecuniary nature.'" *Biondi v. Nassimos*, 300 N.J. Super. 148, 153 (App. Div. 1997) (quoting *Ward v. Zelitovsky*, 136 N.J. 516, 540 (1994)). "Awards based on a plaintiff's testimony alone or on inferred damages are unacceptable. Rather, proof that an existing relationship has been seriously disrupted or testimony of third parties detailing a diminished reputation will be necessary to satisfy the requirement that special damages exist before a jury may award any other type of damages." *Ward*, 136 N.J. at 540. (internal quotation marks and citations omitted).

Starland argues that Defendants cannot—as a matter of law—prevail on their slander counterclaim because, among other reasons, they have failed to set forth any proof of special damages. (*See* Pl. Br. at 15-16.) In response, Defendants argue that "[s]pecial damages need only be proven where an alleged defamation did not involve defamation *per se*." (Def. Opp'n Br. at 18.) (citing *Jobes v. Evangelista*, 369 N.J. Super. 384, 397 (App. Div. 2004)).

Defendants' argument that they need not prove special damages to survive summary judgment as to their defamation counterclaim is misguided because Defendants' counterclaim for defamation is premised on slander, not slander *per se*. While Defendants' argument may be

---

[6] In their opposition brief, Defendants concede that they have not pled a claim for libel. (Def. Opp'n. Br. at 17.) Rather, they acknowledge that their defamation claim is premised on Starland's alleged slanderous statements. (*See id.*) In light of Defendants' acknowledgement that they are not pursuing a libel counterclaim, the Court need not address the propriety of granting summary judgment as to same.

valid as to their counterclaim for slander *per se* (Count II of the counterclaim), it is not valid as to their claim for defamation (Count I of the counterclaim).

Having determined that special damages is an essential element of their defamation counterclaim, it becomes necessary to consider whether there are sufficient facts in the record to support a reasonable finding that Defendants have sustained special damages as a result of Starland's alleged slanderous statements to Callahan. Defendants argue that as a result of Starland's defamatory statements about Fusari's relationship with Germanotta published in *Poker Face*, Hamilton disallowed Fusari from continuing to work with his teenage daughter. (*See* Def. Opp'n. Br. at 19.) As a result, Defendants suggest that Fusari suffered a specific economic harm. (*See id.*)

Defendants' argument is unavailing. To create a genuine issue of material fact as to whether they suffered special damages, Defendants must point to evidence other than their own testimony. *See, e.g., Ward*, 136 N.J. at 540. The only evidence in the record suggesting that *Poker Face* was the reason that Hamilton terminated the professional relationship between his daughter and Fusari is Fusari's own deposition testimony. (*See* Fusari Depos. Tr. at 257-58.) In fact, only Fusari's own speculation suggests either that Hamilton read *Poker Face* or that he took any action as a result of the allegedly slanderous statements published in that book. (*See id.* at 257-60.) This speculation is insufficient to raise a genuine issue of material fact as to whether Defendants have suffered special damages. *See Ridgewood Bd. of Educ.*, 172 F.3d at 252. Accordingly, the Court will grant summary judgment as to Defendants' counterclaim for defamation.

ii.   Propriety of Granting Summary Judgment as to Defendants' Counterclaim for Slander *Per Se*

25

The elements of a slander *per se* claim are the same as those for a defamation claim, except that special damages need not be proven. *See Ward*, 136 N.J. at 540. "Slander *per se* exists when one accuses another: '(1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct.'" *Too Much Media, LLC v. Hale*, 413 N.J. Super. 135, 166-67 (App. Div. 2010) (quoting *McLaughlin v. Rosario, Bailets & Talamo*, 331 N.J. Super. 303, 313-14 (App. Div. 2000)). Even if otherwise defamatory, the following types of statements cannot—as a matter of law—give rise to a claim for slander *per se*: true statements, substantially true statements, and statements of opinion. *See Ward*, 136 N.J. at 530 ("True statements are absolutely protected under the First Amendment."); *Kenny*, 205 N.J. Super. at 193 ("A statement can be 'fairly accurate' and still be considered the truth as a defense to a defamation claim."); *Govito v. West Jersey Health System, Inc.*, 332 N.J. Super. 293, 305 (App. Div. 2000) ("A plaintiff does not make a prima facie claim of defamation if the contested statement is essentially true.") (citation omitted); *DeAngelis v. Hill*, 180 N.J. 1, 14 (2004) ("Statements of opinion, as a matter of constitutional law, enjoy absolute immunity.") (citation omitted).

It is apparent to the Court that none of the following alleged statements fall into any of the four slander *per se* categories, and thus cannot give rise to a slander *per se* cause of action:[7]

- "That the Plaintiff was working as a scout for New Jersey-based producer Fusari." (Counterclaim at ¶ 7(a).)

---

[7] It bears mentioning that Defendants have failed to present any coherent argument as to why these statements fall into any of the slander *per se* categories. Rather, Defendants argue that there are questions of fact as to whether Starland actually made these statements. In a number of instances, Defendants also make conclusory assertions that these statements disparaged Fusari's professional reputation. *(See generally* Def. Opp'n. Br. at 20-29.) Whether Starland actually made these statements is immaterial to whether they fall into any of the slander *per se* categories. Additionally, Defendants' conclusory assertions that these statements had a negative impact on Fusari's reputation are insufficient to create triable issues as to whether these statements fall into any of the slander *per se* categories.

- "That 'Fusari had tasked Starland with finding a girl who was twenty-five years old or younger, who, in his words, 'could be the lead singer of the Strokes.'" (*Id.* at ¶ 7(b).)

- "That Starland's 'first mistake' was not getting an agreement with Fusari in writing." (*Id.* at ¶ 7(d).)

- "That 'Starland was helping with Fusari and a future record deal.'" (*Id.* at ¶ 7(h).)

- "That, despite, *inter alia*, 'Fusari's claim that [the Gaga name] was the result of misspelled text, Gaga's claim that it was something Fusari said to her while she was playing a Queen B-side, 'You're so gaga!,' 'the name arrived in a far more typical, pedestrian way: a marketing idea.'" (*Id.* at ¶ 7(i).)

- "That the Plaintiff told Gaga that she spent 'all this time and energy and work writing these songs and creating a vision [for her], putting all this together.'" (*Id.* at ¶ 7(l).)

- "That the Plaintiff 'discover[ed Gaga] and introduc[ed] her to Fusari.'" (*Id.* at ¶ 7(m).)

With respect to Starland's alleged defamatory statement "[t]hat Fusari developed a romantic relationship with Stefani despite the fact that he had a fiancée," (*see* Counterclaim at ¶ 7(j)), the statement is substantially true, and Defendants do not argue otherwise in their opposition brief. In fact, in their responsive Rule 56.1 statement, Defendants acknowledge that Fusari developed a romantic relationship with Germanotta while he was romantically involved with Digregorio, to whom he had once been engaged. (*See, e.g.,* Def. Resp. SUMF at ¶ 16.)[8]

As for the alleged defamatory statement "[t]hat Starland asked Fusari 'why he would jeopardize his current relationship; he told her that the prospect of the money and the fame 'was a rush,'" (*see* Counterclaim at ¶ 7(k)), the first part of the statement—which suggests that Fusari

---

[8] Defendants neither specifically admit nor deny Starland's assertion that Fusari developed a romantic relationship with Germanotta while he was in a romantic relationship with Digregorio in their responsive Rule 56.1 statement; rather they respond with the word, "Qualify," and proceed to provide a narrative. "Qualify" is not a procedurally proper response to a Rule 56.1 statement. *See* Loc. Civ. R. 56.1. Accordingly, Starland's assertion is deemed admitted. *See id.*

was romantically involved with Germanotta—is not actionable because it is indisputably true that Fusari and Germanotta had a romantic relationship. As for the second part of the Statement, which suggests that the "rush" of money and fame motivated Fusari to become romantically involved with Germanotta, there is a genuine issue of material fact as to whether Starland's allegedly false attribution of this statement to Fusari amounts to an accusation that Fusari engaged in conduct incompatible with his business. Specifically, a reasonable jury may find that Starland diminished Fusari's reputation within his professional community by suggesting that his quest for a "rush" interfered with his ability to maintain his work and private lives separate.

Finally, with respect to the remainder of Starland's alleged defamatory statements, Defendants have failed to properly deny that any of these statements are substantially true in their responsive Rule 56.1 statement. That is, without specifically admitting or denying Starland's assertion that the alleged defamatory statements in Paragraghs 7(c), 7(e), 7(f), and 7(g) of the counterclaim are substantially true, Defendants provide a narrative response. (*See* Def. Resp. SUMF at ¶¶ 26, 28, 29, 30.) This is improper under Local Civil Rule 56.1. *See* Loc. Civ. R. 56.1; *see also Owens v. Am. Hardware Mut. Ins. Co.*, No. 11-6663, 2012 U.S. Dist. LEXIS 182953, at *8 n.4 (D.N.J. Dec. 31, 2012) ("The proper response to a procedurally correct Rule 56 motion is to file a counter statement that denies the fact is material, admits the material fact, or denies the material fact by counter proofs conforming to the rules of evidence."). Therefore, the Court considers the substantial truth of the statements alleged in Paragraphs 7(c), 7(e), 7(f), and 7(g) of the counterclaim to be undisputed. Thus, these statements cannot give rise to a valid slander *per se* counterclaim. *See, e.g., Kenny*, 205 N.J. Super. at 193; *Govito*, 332 N.J. Super. at 305.

For the foregoing reasons, Starland's motion for summary judgment is granted as to Defendants' slander *per se* counterclaim insofar as this counterclaim is premised on the first part of the statement alleged in Paragraph 7(k)[9] and the statements alleged in Paragraphs 7(a)-(j) and 7(l)-(m) of the counterclaim. The Court will, nevertheless, sustain Defendants' slander *per se* counterclaim to the extent it is premised on the second part of the statement alleged in Paragraph 7(k) of the counterclaim.

      iii.    Propriety of Granting Summary Judgment as to Defendants' Counterclaim for False Light

"The tort of false light has two elements: (1) 'the false light in which the other was placed would be highly offensive to a reasonable person'; and (2) 'the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 589 (2009) (quoting *Romaine v. Kallinger*, 109 N.J. 282, 294 (1988)). "'Reckless disregard' is defined as a high degree of probable falsity, for proof of which [a counterclaimant] must present sufficient evidence to permit the conclusion that [the counterclaim defendant] in fact entertained serious doubts as to the truth of the statements." *Hudak v. Fox*, 215 N.J. Super. 233, 235 (App. Div. 1985) (internal quotation marks and citations omitted).

The Court fails to see how the record could support a reasonable finding that the statements alleged in Paragraphs 7(a)-(b), (d), (h)-(i), and (l)-(m) of the counterclaim could be considered highly offensive. Additionally, the Court is not persuaded by Defendants' conclusory assertion that they have "raised a disputed issue of material fact" as to whether Starland's

---

[9] To be clear, the first part of the statement alleged in Paragraph 7(k) of the counterclaim is "[t]hat Starland asked Fusari 'why he would jeopardize his current relationship.'" The second part of the statement alleged in Paragraph 7(k) is the remainder.

statements could be highly offensive. Accordingly, the statements alleged in Paragraph 7(a)-(b), (d), (h)-(i), and (l)-(m) cannot give rise to a valid false light claim.

As for the alleged statements this Court deemed to be true or substantially true in Section IV.B.c.ii, *supra*, Defendants cannot raise a genuine issue of material fact as to whether Starland acted with knowledge or reckless disregard as to the falsity of these statements. *See, e.g., Andros v. Gross*, No. 03-1775, 2005 U.S. Dist. LEXIS 3545, at *34 (D.N.J. Dec. 21, 2005) (stating that one of the requirements of a false light claim "is, obviously, falsity").

Finally, with respect to the statement alleged in Paragraph 7(k) of the counterclaim, the first part of that statement is not actionable because that statement's suggestion that Fusari and Germanotta were romantically involved is true. (*See* Def. Resp. SUMF at ¶ 17.) As to the second part of that statement, however, there is a genuine issue of material fact as to whether a reasonable person would be highly offended by the suggestion that the "rush" of money and fame would compel one to become romantically involved with another. Additionally, there is a disputed issue of material fact as to whether Starland acted with knowledge or reckless disregard as to the falsity of the statement she attributed to Fusari. Specifically, if a jury were to find that Starland falsely attributed this statement to Fusari, it would follow that the jury could also find that Starland knew that Fusari did not make this statement.

d.  Propriety of Granting Summary Judgment as to Starland's Request
that this Court Impose a Constructive Trust

The New Jersey Supreme Court has "caution[ed] courts generally that a constructive trust is a powerful tool to be used only when the equities of a given case clearly warrant it." *Flanigan v. Munson*, 175 N.J. 597, 611 (2003). New Jersey courts "employ a two-prong test when determining whether a constructive trust is warranted in a given case. First, a court must find that a party committed a wrongful act." *Id.* at 608 (internal quotation marks and citation

30

omitted). "Second, the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient." *Id.*

Starland has failed to satisfy this two-pronged test because there has been no final determination that Defendants have committed any wrongful acts. *See Flanigan*, 175 N.J. at 608. In her reply brief, Starland emphasizes that she "requests partial summary judgment that she is entitled to a constructive trust on [D]efendants' Future Revenue *if, and only if*, the jury finds that Starland is entitled to a portion of that Future Revenue." (Pl. Reply Br. at 7-8) (emphasis added). Essentially, Starland requests that this Court impose a premature remedy to a hypothetical scenario. This Court declines to do so. Accordingly, Starland's motion for summary judgment is denied insofar as the motion seeks the imposition of a constructive trust.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied in its entirety. Starland's motion for summary judgment is granted as to the following affirmative defenses: (a) Starland's complaint fails to state a claim for which relief can be granted, (b) Starland's claims are barred by the Statute of Frauds, (c) Starland's claims are time-barred, (d) Starland's claims are barred by the doctrine of estoppel, (e) Starland's claims are barred by the doctrine of laches, and (f) Starland's claims for breach of contract and breach of fiduciary duty are barred by the doctrine of unclean hands. Starland's motion for summary judgment is also granted as to Defendants' counterclaims for: (a) defamation and (b) slander *per se* and false light to the extent that the slander *per se* and false light counterclaims are premised on the first part of the statement alleged in Paragraph 7(k) and the statements alleged in Paragraphs 7(a)-(j) and 7(l)-(m) of the counterclaim. Starland's motion for summary judgment is denied as to: (a) the imposition of a constructive trust, (b) the defense of unclean hands to the extent that Defendants

will assert this affirmative defense to Starland's claims for unjust enrichment and *quantum meruit*, and (c) Defendants' counterclaims for slander *per se* and false light to the extent that these counterclaims are premised on the second part of the statement alleged in Paragraph 7(k) of the counterclaim. This Opinion shall remain sealed for ten (10) days, after which point the Opinion shall be unsealed unless any party files an appropriate motion to seal.

An appropriate order follows this Opinion.

Dated: _15_ of November, 2013.

JOSE L. LINARES
U.S. DISTRICT JUDGE